UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

ERIC VINCENT OWENS                    CIVIL ACTION

VERSUS                                NO: 10-3296

ABDON CALLAIS OFFSHORE, LLC           SECTION: R(4)


**ORDER AND REASONS**

Before the Court are (1) defendant Abdon Callais Offshore, LLC's motion for partial summary judgment that plaintiff Eric Owens is not entitled to maintenance and cure;[1] (2) Owens's motion for partial summary judgment that he is entitled to $56.98 per day in maintenance, that the increased maintenance rate be applied retroactively, and that he is entitled to attorneys' fees from defendant Abdon Callais;[2] and (3) Abdon Callais's cross motion for partial summary judgment that the current rate of $15.00 per day is adequate, that Owens has reached maximum

---

[1]    (R. Doc. 28.)

[2]    (R. Doc. 10.)

medical cure, and that it does not owe Owens attorneys' fees.[3] Because the Court finds that genuine issues of material fact exist as to whether Abdon Callais can assert the *McCorpen* defense, the Court denies Abdon Callais's motion for partial summary judgment.  Because Owens has met his burden of establishing actual expenses in excess of the current maintenance rate, the Court grants Owens's motion for partial summary judgment in part, finding that the appropriate, reasonable rate for maintenance is $40.00 per day applied retroactively.  The Court denies Abdon Callais's cross-motion for summary judgment, finding that the current rate of $15.00 per day is inadequate and that genuine issues of material fact remain as to whether Owens is entitled to maintenance and cure, whether Owens has reached maximum medical cure, and whether he is entitled to attorneys' fees.

I.   **BACKGROUND**

Owens alleges that he injured his lumbar spine and right shoulder on December 30, 2009 while working aboard Abdon Callais's vessel, the M/V CHRISTOPHER CALLAIS.[4]  Owens reported

---

[3]      (R. Doc. 17.)

[4]      (R. Doc. 1 at 4; R. Doc. 10-1 at 1; R. Doc. 22 at 5.)

his injury to the vessel's captain and was brought to shore on January 1, 2010.[5]  Owens remained in Abdon Callais's employ on light duty until August 9, 2010.[6]  During that time, Owens received a wage of $200.00 per day for every day that he remained at Abdon Callais's bunkhouse facility, where he received food and lodging.[7]  When he did not stay at the bunkhouse, he received only maintenance at a rate of $15.00 per day.[8]  According to the affidavit of Ron Holman, Abdon Callais's Director of HSE and Training, Owens remained at the bunkhouse, and thus received wages, for 191 days between the date of the accident and August 9, 2010.[9]  Holman further states that Owens was absent, and therefore received only maintenance, for 45 days during that period.[10]  Since leaving his job on August 9, 2010, Owens has

---

[5]     (R. Doc. 17-4 at 73, 79.)

[6]     (R. Doc. 17-5 at 42.)

[7]     (*Id.*; R. Doc. 17-4 at 82-84.)

[8]     (R. Doc. 17-4 at 84; R. Doc. 17-5 at 42.)

[9]     (R. Doc. 17-5 at 42.)

[10]     (*Id.*)  The Court notes that, despite Holman's statement that Owens remained at the bunkhouse for 191 days and was absent 45 days between December 30, 2009 and August 9, 2010, there are, in fact, only 221 days between those two dates.  As such, there is an error in Holman's account that must be addressed at trial.

received maintenance at the same rate of $15.00 per day.[11]  Owens is 47 years old and currently resides in Pensacola, Florida.

Although the record does not contain Owens's complete medical records, Owens testified that, several days after he was brought to shore, he was examined by Dr. Brett Casey, who indicated that Owens may have a herniated disc.[12]  According to Owens, following an MRI, he was then referred to Dr. Michael Haydel, who gave him a series of epidural injections.[13]  Owens testified that Dr. Haydel then referred Owens to Dr. Christopher Cenac, an orthopedic spine surgeon, who recommended surgery but wanted to wait until Owens had lost weight before proceeding.[14]  According to Owens, he saw Dr. Cenac for several follow-up visits, but eventually decided to get a second opinion because he "just couldn't deal with the pain anymore."[15]  Owens stated that, at that point, he left the bunkhouse facility to return home to Pensacola, Florida, where he was treated by Dr. Charles Wolff.[16]

---

[11]   (*Id.*; R. Doc. 17-4 at 92.)

[12]   (R. Doc. 17-4 at 81-82.)

[13]   (*Id.* at 82.)

[14]   (*Id.* at 83.)

[15]   (*Id.* at 85.)

[16]   (*Id.* at 85-86.)

Owens further testified that, although his back pain was his main concern after the accident, he began having shoulder pain immediately after the accident and was scheduled for shoulder surgery on March 10, 2011.[17]

Dr. Wolff's records indicate that Owens underwent a microdiscectomy at L4-S1 on August 25, 2010.[18]  On September 16, 2010, Dr. Wolff reported that Owens was "doing well from [the surgery] but he's having shoulder pain."[19]  On September 30, 2010, Dr. Wolff again noted that Owens was doing "very well from his microdiskectomy," but stated that "[u]nfortunately, there is something significantly wrong in the cervical spine."[20]  Dr. Wolff further reported that he "would like to get an MRI of the cervical spine as well as flexion and extension of the cervical spine secondary to the fact that he hurts significantly worse when he does flexion and extension of the cervical spine."[21]  Dr. Wolff's records indicate that Owens was scheduled for an additional MRI on November 29, 2010 but that Owen was a "No Show"

---

[17]   (*Id.* at 89.)

[18]   (R. Doc. 17-5 at 77.)

[19]   (R. Doc. 17-5 at 76.)

[20]   (*Id.* at 75.)

[21]   (*Id.*)

for the appointment.[22]

Owens underwent an independent medical examination by Dr. Gordon Nutik on February 9, 2011.[23]  In his report, Dr. Nutik wrote that Owens "gives a history of complaints about the neck and right shoulder occurring immediately following the incident however there is no documentation of any neck or shoulder complaints until documentation of right should tenderness in a note on October 15, 2010."[24]  Dr. Nutik also stated that Owens "show[s] objective clinical findings to indicate disability about the right shoulder" and that "further treatment for the right shoulder is appropriate but unrelated to the incident of 12/29/09 based on the review of the records."[25]  With regard to Owens's back injury, Dr. Nutik noted that Owens had undergone "a surgery to do microdiscectomies, partial hemilaminectomies and medial facetectomies at the L4-5 and L5 sacral levels on the left" and opined that Owens "should be reaching a point of maximum medical improvement concerning the low back region."[26]  Dr. Nutik also

---

[22]   (*Id.* at 73.)

[23]   (*Id.* at 67-71.)

[24]   (*Id.* at 70.)

[25]   (*Id.* at 70-71.)

[26]   (*Id.* at 71.)

noted that a repeat MRI had been recommended by Owens's treating physician and that he "would be interested in reviewing the new MRI as well as the radiologist's report [and] the images from the initial MRI following which I will send a supplemental report."[27]

The record also contains the deposition of Dr. Cenac, who testified that Owens's initial MRI revealed a broad based central and left paracentral disc protrusion with an annular tear at L5-S1 with effacement of the existing S1 nerve root and left greater than right recessed stenosis.[28]  Dr. Cenac further testified that he recommended that Owens undergo a microdiscectomy at L5 and S1. Dr. Cenac stated that he also recommended a gastric bypass or lap-band procedure prior to surgery, because Owens's weight would have made the surgery difficult.  When asked whether Owens would have been able to return to work following the recommended surgery, had he performed it, Dr. Cenac testified that Owens "potentially" would have been able to return to fully duty after six months.[29]

Abdon Callais now moves for partial summary judgment that it is not required to pay Owens maintenance and cure because it is

---

[27]     (*Id.*)

[28]     (*Id.* at 54.)

[29]     (*Id.* at 62-63.)

7

entitled to assert the *McCorpen* defense.  In support, Abdon
Callais submits Owens's medical records from a July 18, 2006
emergency room visit.  Those records indicate that Owens went to
the emergency room with complaints of low back pain and decreased
sensation/numbness in the left thigh.[30]  The records further
reflect that an X-ray conducted at Sacred Heart Hospital on the
same day revealed "[s]light posterior listhesis of L5 relative to
S1 and slight posterior positioning of the distal coccyx."[31]
Abdon Callais also submits Owens's May 21, 2007 medical history
questionnaire, which Owens was required to submit along with his
employment application.  On that questionnaire, Owens was asked
to "Circle Y for YES and N for NO if you currently have the
following symptoms or have significantly in the past."[32]  Owens
circled "N" for "Injured back/back pain."[33]

     For his part, Owens moves for partial summary judgment
seeking a retroactive increase in the daily maintenance rate and
attorneys' fees related to the alleged underpayment.  In
response, Abdon Callais has filed a cross-motion for summary

---

[30]    (R. Doc. 28-6 at 6.)

[31]    (R. Doc. 28-7 at 2.)

[32]    (R. Doc. 28-8 at 3.)

[33]    (*Id.*)

judgment that it is not obligated to increase the maintenance rate; that Owens has reached maximum medical cure; and that Owens is not entitled to attorneys' fees.

## II.  STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008).  All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."  *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil* 2d § 2738 (1983)).

If the dispositive issue is one on which the moving party
will bear the burden of proof at trial, the moving party "must
come forward with evidence which would 'entitle it to a directed
verdict if the evidence went uncontroverted at trial.'"  *Int'l
Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th
Cir. 1991).  The nonmoving party can then defeat the motion by
either countering with sufficient evidence of its own, or
"showing that the moving party's evidence is so sheer that it may
not persuade the reasonable fact-finder to return a verdict in
favor of the moving party."  *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party
will bear the burden of proof at trial, the moving party may
satisfy its burden by merely pointing out that the evidence in
the record is insufficient with respect to an essential element
of the nonmoving party's claim.  *See Celotex*, 477 U.S. at 325.
The burden then shifts to the nonmoving party, who must, by
submitting or referring to evidence, set out specific facts
showing that a genuine issue exists.  *See id.* at 324.   The
nonmovant may not rest upon the pleadings, but must identify
specific facts that establish a genuine issue for trial.  *Id.* at
325; *see also Little*, 37 F.3d at 1075 ("Rule 56 '*mandates* the
entry of summary judgment, after adequate time for discover and
upon motion, against a party who fails to make a showing

10

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'") (citing *Celotex*, 477 U.S. at 332).

## III. DISCUSSION

### A.    The *McCorpen* Defense

Seamen have a right to maintenance and cure for injuries that they suffer in the course of their service on a vessel, regardless of whether the shipowner was at fault or the vessel unseaworthy.  *See O'Donnell v. Great Lakes Dredge & Dock Co.*, 318 U.S. 36, 41-42 (1943); *Guevara v. Maritime Overseas Corp.*, 59 F.3d 1496, 1499 (5th Cir. 1995).  "Maintenance" is the right of a seaman to food and lodging if he becomes injured during the course of fulfilling his duties to the ship.  *See Guevara*, 59 F.3d at 1499.  "Cure" is the right to necessary medical services. *Id.*  Before a plaintiff can recover maintenance and cure, he bears the burden of alleging and proving the following facts: (a) his engagement as a seaman; (b) that his illness or injury occurred, was aggravated or manifested itself while in the ship's service; (c) the wages to which he may be entitled; and (d) the expenditures or liability incurred by him for medicines, nursing care, board and lodging.  *See Foster v. Brian's Trans. Serv., et al.*, 1993 WL 114528, at *2 (E.D. La. 1993) (citing Martin Norris,

11

2 *The Law of Seamen* § 26.21 at 53 (Supp. 1992)).  Owens was injured while working for Abdon Callais while in the service of one of its vessels.  Accordingly, the Court finds that he qualifies to receive maintenance and cure payments for his injuries.

Maintenance and cure may be awarded "even where the seaman has suffered from an illness pre-existing his employment." *McCorpen v. Cent. Gulf S.S. Corp.*, 396 F.2d 547, 548 (5th Cir. 1968).  Yet, there is a "general principle that it will be denied where he knowingly or fraudulently conceals his illness from the shipowner." *Id.*; *Bodden v. Professional Divers of New Orleans, Inc.*, 2001 WL 1223589, at *2 (E.D. La. 2001).  Specifically, when the shipowner requires a prospective seaman to undergo a pre-hiring medical evaluation, and the seaman either intentionally misrepresents or conceals material medical facts, then the seaman is not entitled to an award of maintenance and cure.  *See McCorpen*, 396 F.2d at 549.  For a shipowner or employer to rely on this legal defense – known as the *McCorpen* defense – to deny the seaman's maintenance and cure claim, the employer must establish: (1) that the seaman-plaintiff has intentionally misrepresented or concealed medical facts; (2) the misrepresented or concealed facts were material to the employer's hiring decision; and (3) there exists a causal link between the

pre-existing disability that was concealed and the disability incurred during the voyage. *Id.; see also Brown v. Parker Offshore Drilling*, 410 F.3d 166, 171 (5th Cir. 2005).

Here, the Court finds that Abdon Callais has failed to establish that Owens is not entitled to maintenance and cure as a matter of law. Despite that Owens alleges injury to both his shoulder and back, Abdon Callais has submitted no evidence to suggest that Owens suffered from any sort of shoulder infirmity before filling out his medical questionnaire. Therefore, even if Abdon Callais could establish the *McCorpen* defense as it relates to Owens's back injury, Owens may still be entitled to maintenance and cure for his shoulder injury. *See St. Pierre v. Gravois Tugs, Inc.*, 2010 WL 2265580, at *2 & n.4 (granting partial summary judgment for the defendant where the elements of the *McCorpen* defense were met for plaintiff's back injury but finding that plaintiff's maintenance and cure claim for a shoulder injury remained viable). *Compare Keys v. Halliburton Co.*, 1989 WL 54224, at *4 (E.D. La. 1989) (holding that, even though plaintiff suffered injuries to his head and neck, and the *McCorpen* defense did not apply to those injuries, defendant was entitled to partial summary judgment on the question of maintenance and cure because "[i]t is *only* the injury to his low back, for which the plaintiff has made demand of the shipowner to

13

provide maintenance and cure benefits") (emphasis added).

With regard to Owens's back injury, Abdon Callais submits medical records for a single emergency room visit on July 18, 2006, about one year before Owens completed the medical questionnaire.  Owens came to the emergency room with complaints of numbness in his left thigh and back pain.  His records indicate that there was no apparent mechanism of injury and that the pain consisted of moderate aching.  Owens under went an X-Ray and was diagnosed with "slight posterior listhesis of L5 relative to S1 and slight posterior positioning of the distal coccyx."  He was prescribed naprosyn and prednisone and sent home.  There is no indication in the record that Owens ever filled these prescriptions or sought further treatment.  The Court finds that Owens's medical records do not conclusively establish whether, under an objective inquiry, Owens intentionally misrepresented that he had not "significantly" had low back pain in the past, compare *Brown*, 410 F.3d at 174-75 (finding intentional misrepresentation where defendant had been previously terminated for misrepresenting that he had not suffered from "back trouble"), or whether a causal link exists between that back pain and the injury he allegedly sustained on board the M/V CHRISTOPHER CALLAIS, see *Parker v. Jackup Boat Service, LLC*, 542 F. Supp. 2d 481, 494-95 (E.D. La. 2008) (finding that defendants

14

had not established a causal link because no evidence existed that plaintiff was re-injured due to the prior accident or that the previous injury contributed to his accident).  Additional information regarding the circumstances of Owens's July 18, 2006 emergency room visit and the nature of his diagnosis is required to make those determinations.  *See, e.g.*, *Wilson v. Kevin Gros Offshore, Inc.*, 2011 WL 121734, at *2 (E.D. La. 2011) (denying defendant's motion for partial summary judgment on maintenance and cure, despite evidence of plaintiff's prior back injury, because genuine issues of material fact existed as to whether plaintiff intentionally concealed his prior injury and whether a causal link existed between the prior injury and the injury that was the subject of the plaintiff's claim).  Accordingly, the Court will consider Abdon Callais's assertion of the *McCorpen* defense as it relates to Owens's back injury at trial.

**B.   Maintenance Rate**

In calculating an award for maintenance, the Court must first estimate the "plaintiff seaman's actual costs of food and lodging; and the reasonable cost of food and lodging for a single seaman in the locality of the plaintiff." *Hall v. Noble Drilling (U.S.), Inc.)*, 242 F.3d 582, 590 (5th Cir. 2001).  In order to recover maintenance, the seaman plaintiff must produce "evidence

15

to the court that is sufficient to provide an evidentiary basis
for the court to estimate his actual costs." *Id.* Provided he
has incurred the expense, the seaman is entitled to the
reasonable cost of food and lodging. *Id.* at 587. To determine
the reasonable costs of food and lodging, the Court may consider
evidence of "the seaman's actual costs, evidence of reasonable
costs in the locality or region, union contracts stipulating a
rate of maintenance or per diem payments for shoreside food or
lodging while in the service of a vessel, and maintenance rates
awarded in other cases for seamen in the same region." *Id.* at
590. "A seaman's burden of production in establishing the value
of maintenance is feather light: his own testimony as to
reasonable cost of room and board in the community where he is
living is sufficient to support an award." *Yelverton v. Mobile
Labs., Inc.*, 782 F.2d 555, 558 (5th Cir. 1986). Lodging includes
those expenses "necessary to the provision of habitable housing,"
including utility costs. *Hall*, 242 F.3d at 587 n.17. "A seaman
need not present evidence of the reasonable rate; a court may
take judicial notice of the prevailing rate in the district."
*Id.* at 590. Second, after the court calculates the plaintiff's
actual costs and the reasonable costs, the Court must compare the
two. "If actual expenses exceed reasonable expenses, the court
should award reasonable expenses. Otherwise, the court should

16

award actual expenses." *Id.*

Owens submits an affidavit attesting that his actual monthly food and lodging expenses from December 30, 2009 are as follows: $875.00 for rent, $223.44 for electricity, $135.96 for water, $175.00 for natural gas, $300.00 for food.[34]  These expenses total $1,709.40 per month, or $56.98 per day.  In support of his claims, Owens also submits a lease agreement[35] and receipts[36] stating that his rent is $875.00 per month and a notice from Gulf Power Company demanding $223.44 for continuation of electric service.[37]

Abdon Callais argues that Owens has not met his burden of establishing that he incurs $56.98 per day in actual expenses. It contends that only Owens's lease agreement is competent evidence of his actual expenses, as the overdue notice from Gulf Power Company does not state his monthly charge for electricity.[38]  Abdon Callais also maintains that Owens's self-serving affidavit is an insufficient basis for summary judgment

---

[34]   (R. Doc. 10-2. at 4-5.)

[35]   (*Id.* at 9-15.)

[36]   (*Id.* at 6-8.)

[37]   (*Id.* at 16.)

[38]   (R. Doc. 16 at 4; R. Doc. 17-1 at 4.)

in the absence of supporting evidence.[39]  Yet, as discussed above, the Fifth Circuit has held that the "burden of producing expenses is 'feather light,' and a court may award reasonable expenses, even if the precise amount of actual expenses is not conclusively proved." *Hall*, 242 F.3d at 588.  Based on Owens's affidavit, his lease agreement, receipts, and past-due electric notice, the Court finds that plaintiff has satisfied his feather light burden of demonstrating actual costs in the amount of $56.98 per day.  The Court must therefore determine whether those actual expenses are reasonable.  In doing so, the Court may look to expert testimony about the cost of living in the area of the seaman's residence, "maintenance rates negotiated by unions, per diem allowances for seamen in port with the vessel's facilities are unavailable, and, of course, the cost of food and lodging equivalent to food and lodging on the vessel, if such exist on land." *Hall*, 242 F.3d at 587.

Abdon Callais contends that Owens is entitled only to the cost of food and lodging equivalent to what he could obtain the aboard a vessel.[40]  In justifying its payment of $15.00 per day, Abdon Callais relies on the affidavit of Robert Lasseigne, its

---

[39]     (R. Doc. 16 at 4-5; R. Doc. 17-1 at 4-5.)

[40]     (R. Doc. 16 at 5; R. Doc. 17-1 at 5.)

purchasing manager, who states that Abdon Callais spends $11.00
per crew member per day for food.[41]  Thus, by implication, Abdon
Callais suggests that $4.00 per day, or $120 per month, is the
reasonable cost of rent and utilities.  Although Abdon Callais
acknowledges that even the cheapest lodging in the Pensacola,
Florida area exceeds $120 per month,[42] it states that "a typical
ship that lodges sailors provides very cramped sleeping quarters,
often with two or more sailors sharing a room" and that "[a]ll of
the sailors aboard share the head and the galley, and privacy
aboard the ship is virtually nonexistent."[43]

The Court rejects Abdon Callais' narrow estimation of
reasonable lodging expenses.  Although "the notion that the ship
owner must provide the seamen with the equivalent of his food and
lodging on the ship remains the touchstone for calculating
maintenance," *Hall*, 242 F.3d at 587, Abdon Callais ignores the
Fifth Circuit's observation that "courts have not required
literal equivalence of facilities onshore and in the vessel."
*Id*. ("[T]he determination of maintenance is [ ] complicated by
the fact that little, if any, lodging on land is truly equivalent

---

[41]    (R. Doc. 17-5 at 1.)

[42]    (R. Doc. 16 at 6; R. Doc. 17-1 at 6.)

[43]    (R. Doc. 16 at 6; R. Doc. 17-1 at 6.)

to quarters on a vessel."). The Court thus looks to recent judicial decisions to determine the prevailing reasonable rate of maintenance.

Courts in the Fifth Circuit have approved rates ranging from $30 to $40 per day. *See, e.g.*, *Hall*, 242 F.3d at 591 (upholding the district court's finding that maintenance rates of $30.50 and $31.50 were reasonable amounts for single seamen and noting that a reasonable $15 per day award in 1978 is equivalent to $38.35 in 1999 dollars); *Nelton v. Cenac Towing Co., LLC*, 2011 WL 289040, at *22 (E.D. La. 2011) (finding that a maintenance rate of $35.00 per day is reasonable); *Mier v. Wood Towing, LLC*, 2010 WL 2195700, at *6 (E.D. La. 2010) (finding that a maintenance rate of $40.00 per day is reasonable); *Harrison v. Diamond Offshore Drilling, Inc.*, 2008 WL 708076, at *22 (E.D. La. 2008) (finding that a maintenance rate of $37.00 per day is reasonable and noting that the rate of $31.50 per day recognized as reasonable in *Hall* in 2001 would be roughly equivalent to $38.00 per day in 2008); *Nichols v. Weeks Marine, Inc.*, 513 F. Supp. 2d 627, 639 (E.D. La. 2007) (finding that a maintenance rate of $30 per day is reasonable). Considering these recent awards, the Court finds that the requested rate of $56.98 exceeds reasonable expenses. Based on Owens's actual expenses, however, the Court further finds that the appropriate, reasonable maintenance rate is $40.00

20

per day.

Abdon Callais also argues that, because it paid Owens $200 per day for 191 days between the date of Owens's injury, December 30, 2009, and August 9, 2010, the date on which Owens stopped working for Abdon Callais, it is entitled to a credit of $38,200 ($200 * 191) toward Owens's maintenance payments.[44]  This argument misconstrues the nature of maintenance payments. "Maintenance is the equivalent of the food and lodging to which a seamen is entitled while at sea . . . [and] is neither a substitute for wages nor is it to be considered in lieu of wages in whole or part." *Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 378 (5th Cir. 1989) (quoting *Morel v. Sabine Towing & Transportation Co.*, 669 F.2d 345, 346 (1982).  "[A]bsent an explicit contractual provision specifying that . . . wages [are] to be deemed a substitute for maintenance, there is no basis for crediting such earned wages against the vessel owner's maintenance obligation."  *Ceja v. Mike Hooks, Inc.*, 690 F.2d 1191, 1197 (5th Cir. 1992), *overruled on other grounds by Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir. 1997).  While Abdon Callais was not required to provide maintenance to Owens while it provided him with food and lodging at its

---

[44]     (R. Doc. 16 at 7-9; R. Doc. 17-1 at 7-9.)

bunkhouse, *cf. Hall*, 242 F.3d at 587 (noting that a seaman is entitled to the reasonable cost of food and lodging "provided he has incurred the expense"), the wages Abdon Callais paid Owens while he worked on light duty do not offset Abdon Callais payment of an inadequate maintenance rate.  Accordingly, the Court finds that Abdon Callais is not entitled to a credit against Owens's maintenance claim for its payment of wages.


**C.    Maximum Medical Cure**

Generally, a maritime employer's obligation to provide maintenance and cure ends when a doctor provides a qualified medical opinion that plaintiff has reached maximum medical improvement.  *Breese v. AWI, Inc.*, 823 F.2d 100, 104 (5th Cir. 1987).  A seaman reaches maximum medical improvement when it appears "probable that further treatment will result in no betterment in the claimant's condition." *Rashidi v. Am. Pres. Lines*, 96 F.3d 124, 128 (5th Cir. 1996).  "[A]mbiguities or doubts in the application of the law of maintenance and cure are resolved in favor of the seaman." *Gaspard v. Taylor Driving & Salvage Co.*, 649 F.2d 372, 374 n.2 (5th Cir. 1981).  "[W]here it appears that the seaman's condition is incurable, or that further treatment will merely relieve pain and suffering, but not otherwise improve the seaman's physical condition, it is proper

22

to declare that the point of maximum medical cure has been achieved." *Pelotto v. L & N Towing Co.*, 604 F.2d 396, 400 (5th Cir. 1979).

Abdon Callais argues that it is no longer obligated to pay Owens maintenance, contending that Owens has reached maximum medical cure.[45]  Abdon Callais relies on Dr. Cenac's testimony that he usually recommends six months off work following a microdiscectomy,[46] and on Dr. Nutik's statement that Owens "should be reaching a point of maximum improvement concerning the low back region."[47]  Yet, in the absence of Owens's complete medical records, the Court finds that there is a genuine issue of material fact as to whether Owens has reached maximum medical cure.  Dr. Cenac did not examine Owens following the surgery, and Dr. Nutik's report does not state that Owens has definitively reached the point of maximum medical cure.  Dr. Nutik also noted that he would be interested in receiving the follow-up MRI recommended by Owens's treating physician and that he would file a supplemental report.  That report, assuming it exists, is not in the record.  Moreover, although Owens did not initially

---

[45]    (R. Doc. 16 at 9-10; R. Doc. 17-1 at 9-10.)

[46]    (R. Doc. 17-5 at 62.)

[47]    (*Id.* at 71.)

complain of a shoulder injury at the time of his accident, he now maintains that his shoulder began hurting immediately after the accident.[48]  Despite Dr. Nutik's opinion that he "did not relate [Owens's] neck or right shoulder complaints to the incident of December 29, 2009,"[49] there is insufficient evidence in the record for the Court to find conclusively that Owens's shoulder pain is unrelated to the accident.  As such, a genuine issue of material fact remains, and summary judgment is therefore inappropriate.

**D.   Attorneys' Fees**

In addition to an increased maintenance rate, Owens argues that he is entitled to damages, in the form of attorneys' fees, for Abdon Callais's failure to pay a reasonable rate of maintenance.  Upon receiving a demand for maintenance and cure, "a shipowner need not immediately commence payments; he is entitled to investigate and require corroboration of the claim." *Morales v. Garijak, Inc.*, 829 F.2d 1355, 1358 (5th Cir. 1987). If, however, the shipowner's failure to pay is "callous and recalcitrant, arbitrary and capricious, or willful, callous, and

---

[48]   (R. Doc. 17-4 at 87-88.)

[49]   (R. Doc. 17-5 at 70.)

24

persistent," the shipowner may be liable for punitive damages in the form of attorneys' fees.  *Id.* (citing *Vaughn v. Atkinson*, 369 U.S. 527 (1962) (awarding attorneys' fees for damages based on employer's failure to pay maintenance)); *see also Atlantic Sounding Co., Inc. v. Townsend*, 129 S. Ct. 2561, 2571–75 (2009) (reaffirming *Vaughn* and holding that punitive damages in the form of attorneys' fees are available under federal maritime law for "delayed or improper provision of maintenance and cure").

Owens maintains that, because of the insufficient maintenance rate, by the time of trial, he will have been forced to borrow $26,661.42 from his attorneys, which is Owens's estimate of the difference between the current maintenance rate and his actual expenses from the time of his injury through trial.[50]  Owens further states that, because the amount borrowed from his attorneys must be taken out of any settlement or judgment that he may obtain, and because a settlement or judgment is subject a 40 percent contingency fee, he is entitled to $10,644.56 (.4 * $26,611.42) in damages from Abdon Callais.[51] While there appears to be merit to Owens's argument, because there is a genuine issue of material fact as to whether Owens is

_____

[50]    (R. Doc. 10-1 at 8.)

[51]    (*Id.*)

25

entitled to maintenance, the Court denies Owens's motion at this time and will address the issue of attorneys' fees at trial.

## IV.   CONCLUSION

For the foregoing reasons, Abdon Callais's motion for partial summary judgment[52] is DENIED.   Owens's motion for partial summary judgment[53] is GRANTED IN PART and DENIED IN PART.   Abdon Callais's cross-motion for partial summary judgment[54] is DENIED.

New Orleans, Louisiana, this 14th day of June, 2011.

*Sarah Vance*
_____

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE

---

[52]   (R. Doc. 28.)

[53]   (R. Doc. 10.)

[54]   (R. Doc. 17.)

26