UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

ERIC VINCENT OWENS                          CIVIL ACTION

VERSUS                                      NO: 10-3296

ABDON CALLAIS OFFSHORE, LLC                 SECTION: R(4)

## ORDER AND REASONS

The Court conducted a two-day bench trial on plaintiff Eric Owens's claims of negligence under the Jones Act, 46 U.S.C. § 30104(a), and unseaworthiness under the general maritime law against Abdon Callais Offshore, LLC on August 1 and 3, 2011. This Court has original jurisdiction over this matter pursuant to the Jones Act and the Court's admiralty jurisdiction under 28 U.S.C. § 1333.  After hearing live testimony and reviewing all the evidence, the Court rules as follows.  To the extent a finding of fact constitutes a conclusion of law, the Court adopts it as such.  To the extent a conclusion of law constitutes a finding of fact, the Court adopts it as such.

## I.   FINDINGS OF FACT AND CONCLUSIONS OF LAW

## A.   Background

Owens brought this action because he was injured when transferring a "mud hose" aboard Abdon Callais's vessel, the M/V CHRISTOPHER CALLAIS on December 30, 2009.  Owens began to work

for Abdon Callais as an engineer in May 2007.  Before that, Owens held a number of different jobs.  After completing high school, Owens worked as an able bodied seaman, a deckhand, a laborer, and a painter.  At the time of the incident that gave rise to this litigation, Owens was 46 years old and was earning $200.00 per day.  Owens currently resides in Pensacola, Florida.

**B.   Owens's Pre-Employment Representations**

When Owens applied for a position with Abdon Callais, Abdon Callais required him to undergo a pre-employment physical examination.  On May 21, 2007, Owens was examined by doctors at Complete Occupational Health Services, Inc. in Galliano, Louisiana, at the request of Abdon Callais.  As part of his pre-employment physical, Owens completed a medical history questionnaire.  That questionnaire instructed Owens to "Circle Y for YES and N for NO if you have any of the following symptoms or have significantly in the past."[1]  Owens circled "N" next to the line "Injured back/back pain."[2]

In fact, before Owens began to work for Abdon Callais, in July 2006, he went to the emergency room at Sacred Heart Hospital in Pensacola, Florida, complaining of back pain for a period of two weeks and back numbness and decreased sensation in his left

---

[1]    (Jt. Ex. 10 at 6.)

[2]    (*Id.*)

2

thigh for a period of one week.[3]  Although Owens did not undergo
an MRI, X-rays of his lower spine were performed, which revealed
slight posterior listhesis of L5 relative to S1 and slight
posterior positioning of the distal coccyx.[4]  Owens was given
Tylenol 3 for pain and prescribed Naprosyn, an anti-inflammatory,
and Prednisone, a steroid.[5]  At trial, Dr. Gordon Nutik, an
expert in orthopedic surgery, testified that, although disc
herniation cannot be seen on an X-ray, given Owens's complaints
of numbness in the left thigh, there is a high likelihood that he
suffered from nerve impingement at that time.[6]

**C.   The Incident**

On December 29, 2009, Owens was the second engineer aboard
Abdon Callais's vessel, the CHRISTOPHER CALLAIS, which was
located at the HERCULES 173 platform in the Gulf of Mexico
serving as a support vessel.  Shortly before midnight, Owens took
part in a joint safety analysis (JSA) with several other members
of the crew: Captain Christopher Standish, Captain Scott
Ferguson, Jeff Taylor, Jimmal Hewitt, and Philip Joseph.[7]

---

[3]    (Jt. Ex. 6 at 76.)

[4]    (*Id.* at 78-79.)

[5]    (*Id.* at 82; Rak Depo at 9, 18.)

[6]    (Trial Tr., Day II at 61-62.)

[7]    (Trial Tr., Day I at 67-68.)

3

Following the JSA, Owens relieved Taylor, the lead engineer, at a "pass down" meeting.[8]  After showing Owens several tasks that had to be completed in the engine room, Taylor informed Owens that a water and drilling mud transfer to the platform had been completed and directed Owens to roll up the water hose and mud hose and put them away in the hose rack.[9]  By the time Owens arrived on deck, Joseph had already rolled up the water hose and was in the process of rolling up the mud hose.[10]   The mud hose was four inches in diameter,[11] weighed somewhere between 120 and 180 pounds, and was located in a narrow space between the cargo and the "headache rack" on the rear deck of the vessel.[12]   In addition, the mud hose was outfitted with "Todo" fittings,[13] which added about 50 to 80 pounds to the weight of the hose.[14] When rolled up, the mud hose formed an oblong coil about four feet in length and three feet in width.[15]  After Joseph and Owens completed rolling up the mud hose, Owens retrieved a dolly from

---

[8]      (*Id.* at 69, 141.)

[9]      (*Id.* at 69-70.)

[10]     (*Id.* at 70.)

[11]     (*Id.* at 142.)

[12]     (*Id.* at 179; Trial Tr., Day II at 88.)

[13]     (Trial Tr., Day I at 142.)

[14]     (*Id.* at 179; Trial Tr., Day II at 88.)

[15]     (Pl. Ex. 28 at 1-3.)

the vessel's deck locker and brought it as close to the mud hose as possible.  The rear deck of the vessel, however, was loaded such that the vessel's cargo prevented Owens from bringing the dolly all the way to the mud hose.[16]  With the dolly about seven feet away,[17] and with the mud hose oriented diagonally on the deck, Owens and Joseph then lifted the mud hose – one person at each end – to transport it to the dolly.[18]  In the process of lifting and turning the mud hose, Owens's back "gave out."[19]

After the incident, Owens informed Captain Ferguson, who was on duty at the time, that he had injured his back while attempting to get the mud hose to the hose rack.[20]  Owens then went to lay down and made engine room checks every 30 minutes for the remainder of his shift.[21]  At some point the same day, Owens informed Captain Standish of his injury and that he was in severe pain.[22]  Although Owens attempted to cope with the pain, its severity increased,[23] and, on January 2, 2010, Owens disembarked

---

[16]     (Trial Tr., Day I at 71-74.)

[17]     (*Id.* at 80.)

[18]     (*Id.* at 81-82.)

[19]     (*Id.* at 82; Joseph Depo. at 21, 23-25.)

[20]     (Trial Tr., Day I at 84.)

[21]     (*Id.* at 85.)

[22]     (*Id.* at 86.)

[23]     (*Id.* at 91.)

at Port Fourchon, Louisiana for medical attention.[24]

At trial, Abdon Callais suggested that, contrary to Owens's testimony, Owens injured his back after he had loaded the mud hose onto the dolly and while he was in the process of transferring the hose from the dolly to the hose rack.  Abdon Callais relied primarily on an accident report completed by Captain Standish and signed by the crew after the incident.  That report describes Owens injury as follows: "Eric Owens, while transferring mud hose from dolly to hose rack apparently tweaked his back while lifting hose, which caused a severe pain to run down his leg . . . pinched nerve."[25]  The Court notes, however, that Captain Standish was not present at the time of Owens's injury and that there may have been a miscommunication between Owens and Standish.  Moreover, Owens's account was corroborated by Philip Joseph, the only other eyewitness to the incident, who testified that Owens injured his back in the area of the vessel "where the mud pumps were" and while he was in the process of putting the mud hose on the dolly.[26]  The Court also credits the testimony of Robert Borison, an expert in the field of offshore safety and safe work practices, who indicated that, once the hose was on the dolly, there would have been no need to lift the hose,

_____

[24]    (Trial Tr., Day II at 34.)

[25]    (Jt. Ex. 1.)

[26]    (Joseph Depo. at 20, 22.)

because one could roll the hose straight from the dolly to the hose rack.[27]  For all these reasons, the Court finds that Owens was injured while lifting the mud hose before he was able to reach the dolly.

## D.  Negligence

Under the Jones Act, a seaman's employer is liable for damages if the employer's negligence caused the seaman's injury. *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335 (5th Cir. 1997) (en banc).  The fundamental duty of a Jones Act employer is to provide his seaman employees with a reasonably safe place to work.  *Colburn v. Bunge Towing*, Inc., 883 F.2d 372, 374 (5th Cir. 1989).  In *Gautreaux*, the Fifth Circuit clarified that an employer is liable under the Jones Act if the negligence of its employees or agents played "any ppart, even the slightest" in causing the injury or death for which damages are sought.  107 F.3d at 335 (citing *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 506 (1957)).  At the same time, the employer's standard of care is not greater than that of ordinary negligence under the circumstances.  *Id*. at 339.  In addition, the seaman's duty of care is not a "slight" duty of care to protect himself from the employer's negligence.  *Id*.  Rather, the seaman is also obliged to act "with ordinary prudence under the circumstances," which

---

[27]     (Trial Tr., Day I at 182.)

include the seaman's reliance on his employer to provide a safe working environment and the seaman's own experience, training, or education.  *Id*.

1.   <u>Abdon Callais's Negligence</u>

The Court finds that Abdon Callais was negligent in allowing the deck of the CHRISTOPHER CALLAIS to become overcrowded with cargo such that Owens could not use the dolly to transfer the mud hose.  Although, as discussed below, other options were available to Owens, by failing to leave sufficient room for the dolly, Abdon Callais deprived Owens of the safest method to transfer the mud hose.  The Court's conclusion is supported by the testimony of Robert Borison, who stated that the overloading of the cargo created a hazard on board the vessel and that the mud hose was too heavy for even two crew members to lift manually.[28] Borison's opinion is consistent with the testimony of Jimmal Hewitt, who indicated that the weight of the mud hose makes it necessary to use the dolly when returning the hose to the hose rack.[29]  Moreover, in his report, Borison identified Captain Standish's failure to address the unavailability of the dolly in the JSA as a contributing cause to Owens's injury.  Borison opined that, both Captain Standish and Captain Ferguson knew or

---

[28]   (*Id.* at 180.)

[29]   (*Id.* at 162.)

should have known that the hoses should have been moved only with the aid of a dolly, and that the area was blocked by cargo, preventing proper movement of the hoses.[30]  According to Borison, "[i]t should have been decided by the captains to either not pump the mud or find a suitable place to leave the mud hose after the transfer operation was completed."[31]

The Court's finding of negligence is further supported by Abdon Callais's safety manual, which states that, "Where mechanical handling equipment is used, sufficient safe clearances will be maintained for aisles, at loading docks, through doorways and wherever turns or passage must be made."[32]  It is undisputed that the dolly qualifies as "mechanical handling equipment" within the meaning of the manual.  By loading the vessel such that Owens could not reach the mud hose with the dolly, Abdon Callais violated its own safety manual, requiring Owens to move the mud hose without the aid of the otherwise available equipment.

2.  Owens's Negligence

The Court also finds that Owens's own negligence contributed to his injury.  Even though using the dolly was the preferred

---

[30]    (Pl. Ex. 5 at 5.)

[31]    (*Id.*)

[32]    (Jt. Ex. 4 at ACO 890.)

method for transferring the mud hose, there were other methods still available to Owens that would not have required him to lift the mud hose as he did.  For example, Jeff Taylor testified that, in situations when he has been unable to get the dolly close enough to the hose, he has rolled the coiled hose on its side to the dolly.[33]  While Owens suggested at trial that the Todo fitting was an impediment to rolling the hose, his own expert suggested that the hose could be rolled from the dolly to the hose rack and did not suggest that the presence of a Todo fitting would have hindered that operation.[34]  Jimmal Hewitt suggested another method, explaining that, when the dolly was not available, he has dragged one end of the mud hose to the hose rack and then rolled the hose up from the other end.[35]  Captain Ronald Campana, an expert in marine safety, testified that these options would have been available to Owens and were preferable to lifting the hose, which was the worst of all possible methods in terms of safety.[36]

In finding that Owens was contributorily negligent, the Court rejects Borison's testimony that the alternate methods suggested at trial would not have prevented Owens's injury.

---

[33]    (Trial Tr., Day I at 146.)

[34]    (*Id.* at 182.)

[35]    (*Id.* at 165.)

[36]    (Trial Tr., Day II at 92-93, 95-96.)

Borison testified that, without the dolly, Owens was required to lift the hose to orient the hose bow-to-stern "where it could be moved any different number of ways down the alleyway between the cargo and the headache rack."[37]  According to Borison, "the accident happened when [Owens] actually *turned*" the mud hose, and "[e]verything that happened after that has absolutely nothing to do with the accident or the causation of the accident."[38]  Yet, common sense dictates that, instead of lifting the hose, Owens could have turned the hose by pivoting it on the deck, obviating the need for lifting it.  The Court finds support for its conclusion in the testimony of Captain Campana, who indicated that, by putting one's hands on the coiled up mud hose, one could leave the hose sitting on the deck and reorient it without "taking any weight whatsoever."[39]  Captain Campana also testified that, if Owens was unable to reach the mud hose with the dolly, he could have pushed the hose to the space underneath the headache rack, where the hose could have remained safely out of the way until the cargo was removed.[40]  This option was also suggested by Captain Standish, who similarly testified that, if for some reason a crew member could not put a mud hose back

---

[37]    (Trial Tr., Day I at 176.)

[38]    (*Id.*) (emphasis added)

[39]    (Trial Tr., Day II at 95.)

[40]    (*Id.* at 94.)

11

immediately, he could safely leave the hose between the headache rack and the bulwarks, out of the way of foot traffic.[41]

Finally, even if the alternate methods of moving the mud hose were not available to Owens, given the overcrowding of the vessel, Owens should have at least informed either Captain Standish or Captain Ferguson of the issue and asked to have the area cleared before transferring the mud hose or for other instructions.  The Court finds support for this finding in Abdon Callais's safety manual.  While the manual instructs generally that, upon the completion of a liquid transfer, crew members should "[d]isconect, inspect and return all hoses/fittings to the proper storage areas," the manual also contemplates situations in which prompt return of the hoses is not possible, indicating that, "[i]f any problems are noticed, notify the Captain immediately."[42]

By proceeding with the transfer and lifting the mud hose, Owens chose the most hazardous course of action, thereby contributing to his own injury.  Based on the live testimony and the other evidence presented at trial, the Court finds that Owens's contributory negligence accounts for 30 percent of the total fault.

---

[41]    (*Id.* at 38.)

[42]    (Jt. Ex. 4 at ACO 00760.)

12

**E.    Unseaworthiness**

To establish a claim for unseaworthiness, "the injured seaman must prove that the owner has failed to provide a vessel, including her equipment and crew, which is reasonably fit and safe for the purposes for which it is used.  In addition, the plaintiff must establish a causal connection between his injury and the breach of duty that rendered the vessel unseaworthy." *Boudreaux v. United States of America*, 280 F.3d 461, 468 (5th Cir. 2002) (citing *Jackson v. OMI Corp.*, 245 F.3d 525, 527 (5th Cir. 2001)).  A vessel's unseaworthiness may arise from various circumstances, including defective gear, appurtenances in disrepair, an unfit crew, an improper method of loading cargo, or an insufficient number of workers assigned to perform a shipboard task.  *See Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499 (1971).  A finding of unseaworthiness, however, cannot be based on an "isolated, personal negligent act."  *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 500 (1971).  Instead, unseaworthiness must be the result of a condition that persists for such time as to become related to the status of the vessel. *Kyzar v. Vale Do Ri Doce Navegacai, S.A.*, 464 F.2d 285, 290 (5th Cir. 1972).  A plaintiff asserting a claim of unseaworthiness need not establish negligence, but bears the burden to show that the unseaworthy condition "played a substantial part in bringing about or actually causing the injury and that the injury was

13

either a direct result or a reasonably probable consequence of the unseaworthiness." *Phillips v. Western Co. of North America*, 953 F.2d 923, 928 (5th Cir. 1992).

The Court finds that the CHRISTOPHER CALLAIS was not unseaworthy at the time of Owens's accident.  Owens presented no evidence that the vessel, its gear, or appurtenances were in any way defective or contributed to his injury.  Nor did Owens establish that the CHRISTOPHER CALLAIS was manned by an unfit crew.  Although Owens's injuries resulted from either Captain Standish's or Captain Ferguson's negligence, that negligence was limited to overloading the vessel on the date of Owens's injury. There has been no suggestion that either Captain Standish's or Captain Ferguson's performance was deficient beyond this incident.  *See Kyzar*, 464 F.2d at 290-91 (explaining that unseaworthiness based on an unfit crew must involve a continuous course of negligent conduct).  For these reasons, the Court rejects Owens's argument that the CHRISTOPHER CALLAIS's alleged unseaworthiness was a cause of his accident.


**F.   Extent and Causation of Owens's Injuries**

On January 6, 2010, several days after Owens was brought to shore, Owens was examined by Dr. Brett Casey.[43]  Owens reported that he had been suffering from back and leg pain since the date

---

[43]    (Jt. Ex. 11 at 7.)

of his accident.[44]  He reported no other injuries from the
incident on the vessel.  After an initial examination, Casey
concluded that Owens may have suffered a lumbar disc
herniation.[45]  An MRI taken the following day revealed a broad
based central and left paracentral disc protrusion with annular
tear at L5-S1 with effacement of the existing left S1 nerve root
and left greater than right recessed stenosis.[46]  Dr. Casey
referred Owens to Dr. Michael Haydel, who gave him a series of
epidural injections.[47]  Owens was then referred to Dr.
Christopher Cenac, an orthopedic spine surgeon, who first saw
Owens on March 15, 2010.[48]

Dr. Cenac diagnosed Owens with a left-sided L5-S1 lumbar
herniation.[49]  Dr. Cenac testified that, because of the size of
the disc herniation abutting the S1 nerve root, Owens "clearly
probably did not have this problem a year or two years ago."[50]
Dr. Cenac further opined that, while Owens's MRI revealed some

---

[44]   (*Id.*)

[45]   (*Id.*)

[46]   (Jt. Ex. 23 at 11.)

[47]   (Jt. Ex. 12 at 6; Trial Tr., Day I at 98-99.)

[48]   (Jt. Ex. 23 at 11, 13.)

[49]   (*Id.* at 12.)

[50]   (*Id.* at 13.)

degenerative changes that likely existed before the incident,[51] the herniated disc was likely caused by a traumatic event.[52]  As with Dr. Casey, Owens did not report any other injury from the December 30, 2009 incident to Dr. Cenac.[53]  Dr. Cenac recommended a microdiscectomy at L5 and S1 levels but wanted to wait until Owens had lost weight before proceeding.[54]  Dr. Cenac stated that he also recommended a gastric bypass or lap-band procedure before surgery, because Owens was morbidly obese, and his weight would have made the surgery difficult.[55]  Owens saw Dr. Cenac for several visits, but eventually decided to get a second opinion because he felt "like he was getting the runaround."[56]  Dr. Cenac testified that, had he performed the surgery, and everything went according to plan, he would have recommended that Owens return to his previous job after a period of approximately six months.[57]

     In August 2010, Owens returned home to Pensacola, Florida, where he was treated by Dr. Charles Wolff.[58]  Owens reported a

---

[51]    (*Id.* at 13-14.)

[52]    (*Id.* at 12.)

[53]    (*Id.* at 15.)

[54]    (*Id.* at 15.)

[55]    (*Id.* at 17-18.)

[56]    (Trial Tr., Day I at 101.)

[57]    (Jt. Ex. 16 at 79; Jt. Ex. 23 at 19-20.)

[58]    (Jt. Ex. 26 at 4.)

six-month history of low back and left leg pain radiating into the front of his shin and the dorsum of his foot, which was worse when he walked and when he was lifting.[59]  Dr. Wolff testified that Owens's MRI revealed a disc herniation that was consistent with an acute injury superimposed upon preexisting degenerative changes.[60]  On August 25, 2010, Dr. Wolff performed a partial discectomy at the L5-S1 and a foraminotomy at the L4-L5,[61] without complications.[62]  On September 30, 2010, at a follow-up visit, Owens reported that his leg pain was somewhat better but that he was having significant right shoulder pain with pain radiating down his arm.[63]  At that point, Dr. Wolff determined that he would like to get an MRI of the cervical spine "to make sure there wasn't something going on there."[64]  Dr. Wolff testified that he was concerned that Owens's positioning during the surgery could have caused injury to his cervical spine or shoulder, or exacerbated a previous injury.[65]  Dr. Wolff's records indicate that Owens was scheduled for an MRI on November

---

[59]   (*Id.* at 7.)

[60]   (*Id.* at 32-33.)

[61]   (Jt. Ex. 14 at 5; Jt. Ex. 26 at 11-13.)

[62]   (Jt. Ex. 26 at 10-11.)

[63]   (*Id.* at 13.)

[64]   (*Id.* at 13; Jt. Ex. 16 at 73, 75.)

[65]   (Jt. Ex. 26 at 15.)

17

22, 2010,[66] but they do not contain any documentation indicating that the MRI was ever performed.[67]  Owens's final visit to Dr. Wolff's office was on February 28, 2011.  Dr. Wolff testified that, at that point, he wanted to try conservative management of Owens's pain.[68]  Owens was referred to Dr. David Fairleigh for pain management.[69]

On November 5, 2010, Owens began seeking treatment for his shoulder from Dr. Stephen Seeker, an expert in orthopedic surgery.[70]  Seeker testified that Owens was referred to him by an urgent care physician's assistant.[71]  According to Seeker, Owens reported shoulder pain lasting several weeks, and Dr. Seeker's records do not reflect that Owens reported his pain to be related to any sort of accident.[72]  Owens's examination revealed pain in his acromioclavicular joint, pain with cross-body abduction, and that Owens was mildly weak in his rotator cuff.[73]  In addition, Owens had "impingement signs," which, according to Dr. Seeker,

---

[66]   (Jt. Ex. 16 at 62.)

[67]   (Jt. Ex. 26 at 16.)

[68]   (*Id.* at 16.)

[69]   (Jt. Ex. 15 at 2-5; Jt. Ex. 26 at 21.)

[70]   (Jt. Ex. 24 at 3-4.)

[71]   (*Id.* at 5.)

[72]   (*Id.*)

[73]   (*Id.* at 6.)

are indicative of rotator cuff tendinitis, bursitis, or a rotator cuff tear.[74]  Owens underwent an MRI, which revealed acromioclavicular joint arthritis with an acromicoclavicular joint spur and a acrominon spur and bursitis.  Dr. Seeker testified that Owens's shoulder condition could have been caused by either injury or arthritis and wear over time.[75]  Owens was treated with physical therapy and anti-inflammatories and given a corticosteriod injection.[76]

Owens returned to Dr. Seeker's office on January 21, 2011 and reported no improvement.[77]  Dr. Seeker then recommended a subacromial decompression and a distal clavicle resection, an arthroscopic procedure to remove bone spurs from a portion of the shoulder.[78]  That surgery was performed on March 10, 2011.[79]  Dr. Seeker saw Owens again on March 22, 2011 and gave Owens postoperative instructions and started Owens on physical therapy.[80]  Dr. Seeker testified that the normal recuperative period for Owens's surgery is three to six months.

---

[74]   (*Id.*)

[75]   (*Id.* at 7.)

[76]   (*Id.*)

[77]   (*Id.* at 8.)

[78]   (*Id.* at 9.)

[79]   (*Id.* at 10.)

[80]   (*Id.* at 12.)

Considering the live testimony at trial and the evidence
submitted by the parties, the Court finds that Owens's lower back
injury was caused by the December 30, 2009 accident.  Owens
testified that his back "gave out," and he began to suffer from
severe pain when he attempted to move the mud hose to the
dolly.[81]  Owens's account was corroborated by Joseph, who
testified that, at some point during the transfer, Owens suddenly
stopped and started repeating "Something ain't right."[82]
Further, Captain Standish testified that, when he encountered
Owens on the evening of December 30, 2009, after the incident,
Owens was unable to stand, in obvious distress, and crying from
pain.[83]  The Court also credits Dr. Cenac's testimony that
Owens's herniated disc was likely caused by a traumatic event.
Although Dr. Cenac was unaware that Owens had gone to the
emergency room in July 2006 for back pain and leg numbness, he
testified that Owens "clearly probably did not have this problem
a year or two ago."[84]  In any event, even if Owens had a
preexisting back condition at the time of the incident, that
condition was apparently asymptomatic, as Owens had worked as an
unlicensed engineer for over two years before moving the mud

---

[81]     (Trial Tr., Day I at 82.)

[82]     (Joseph Depo. at 20-21.)

[83]     (Trial Tr., Day II at 12,

[84]     (Jt. Ex. 23 at 12.)

20

hose.  Owens is therefore entitled to recover damages from Abdon Callais for either causing the injury or the aggravation to his prior condition.  *See Broussard v. Stolt Offshore, Inc.*, 2007 WL 101041, at *3 (E.D. La. 2007) (finding defendants liable, in a Jones Act case, for the aggravation of plaintiff's prior asymptomatic condition); *Stevens v. Omega Protein, Inc.*, 2005 WL 83249, at *7 (E.D. La. 2005) ("[W]hen the defendants' act aggravates or accelerates a preexisting condition and renders a plaintiff unable to continue his work or awakens a dormant condition that causes a plaintiff to experience pain when he did not suffer from pain or disability prior to the aggravation, defendant can be liable in full for the disability and pain caused.").

The Court finds that Owens's shoulder injury, however, did not result from lifting the mud hose.  Although Owens testified at trial that he began having shoulder pain immediately after the accident, the Court does not find that testimony credible. Owens's medical records reflect that Owens did not report any difficulty from his shoulder until September 16, 2010,[85] over eight months after the incident.  The Court finds further support for its conclusion in the testimony of Dr. Nutik, who conducted an independent evaluation of Owens's medical conditions on

---

[85]    (Jt. Ex. 16 at 75; Trial Tr., Day II at 54.)

February 9, 2011.[86]  Dr. Nutik opined that, while Owens's exam revealed indications of right shoulder disability, he did not relate Owens's shoulder disability to the incident aboard the CHRISTOPHER CALLAIS.[87]  Additionally, Dr. Seeker, who performed Owens's shoulder surgery, testified that it was not apparent that Owens's shoulder pain was the result of an accident and could have been caused by arthritis, degeneration, or from his placement during surgery.[88]  As such, the Court concludes that Owens has not established that Abdon Callais's negligence was the cause of his shoulder injury.

**G.   Maintenance and Cure**

  1.   <u>Applicable Law</u>

The duty of maintenance and cure obligates a maritime employer to pay for the lost wages, medical care, food, lodging, and other incidental expenses of a mariner who falls ill or is injured while in the service of a vessel.  *See Aguilar v. Standard Oil Co. of N.J.*, 318 U.S. 724, 730 (1943); *The Osceola*, 189 U.S. 158, 175 (1903).  The duty is practically absolute. Unlike an employer's duties under the Jones Act, liability for maintenance and cure is not predicated on fault or negligence.

---

[86]   (Trial Tr., Day II at 51; Def. Ex. 3 at 1.)

[87]   (Trial Tr., Day II at 55-57.)

[88]   (Jt. Ex. 24 at 11.)

*Aguilar*, 318 U.S. at 730.  Because the duty is so broad, maintenance and cure has been compared to mandatory employer-provided health and accident insurance.  *See Lindquist v. Dilkes*, 127 F.2d 21, 23-24 (3d Cir. 1941) ("Both the shipowner and the insurer assume an obligation whose burden may depend upon the physical condition of the assured and the seaman.  The company gets a cash consideration; the shipowner only a contented mariner."); G. Gilmore & C. Black, *The Law of Admiralty* 281-82 (2d ed. 1975).

In keeping with the absolute nature of the right, a plaintiff's burden of proof on a maintenance and cure claim is slight: he need establish only that he was injured or became ill while "subject to the call of duty as a seaman."  *Aguilar*, 318 U.S. at 732; *see also* 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 6-28 (4th ed. 2004); Fifth Circuit Pattern Jury Instructions: Civil § 4.11 (2006 ed.).  It is not necessary for the plaintiff to show that his injury or ailment originated during the term of his employment.  The employer may be liable even for pre-existing conditions that manifest themselves during the voyage.  *See Jauch v. Nautical Servs., Inc.*, 470 F.3d 207, 212 (5th Cir. 2006) (*per curiam*) ("A seaman may recover maintenance and cure even for injuries or illnesses pre-existing the seaman's employment unless that seaman knowingly or fraudulently concealed his condition from the vessel owner at the

time he was employed."). Generally, the maritime employer's
obligation to provide maintenance and cure ends when a doctor
provides a qualified medical opinion that plaintiff has reached
maximum medical improvement. *See, e.g.*, *Breese v. AWI, Inc.*, 823
F.2d 100, 104 (5th Cir. 1987) (explaining that the question of
whether a seaman is entitled to continued maintenance turns on
whether the individual seaman has reached maximum cure). A
seaman reaches maximum medical improvement when it appears
"probable that further treatment will result in no betterment in
the claimant's condition." *Rashidi v. Am. President Lines*, 96
F.3d 124, 128 (5th Cir. 1996). "[A]mbiguities or doubts in the
application of the law of maintenance and cure are resolved in
favor of the seaman." *Gaspard v. Taylor Diving & Salvage Co.*,
649 F.2d 372, 374 n.2 (5th Cir. 1981).

There are defenses to a claim for maintenance and cure, but
they "are few and narrowly applied." *Silmon v. Can Do II, Inc.*,
89 F.3d 240, 242 (5th Cir. 1996). First, a seaman who causes his
own injury through "some wilful misbehavior or deliberate act of
indiscretion" is not entitled to receive maintenance and cure.
*Aguilar*, 318 U.S. at 731; *see also* Rules of Oleron, art. 6,
reprinted in 2 *The Black Book of the Admiralty* 217 (Sir Travers
Twiss ed. & trans., London, Longman & Co. 1873); *Abbott on
Shipping* 258-59 (J.C. Perkins ed., Boston, Little & Brown 1846).
As the Supreme Court has emphasized, however, the seaman's

behavior must be "positively vicious" before he will be denied maintenance and cure. *Warren v. United States*, 340 U.S. 523, 528 (1951). Negligence or contributory negligence will not itself qualify as misconduct and forfeit the right. *See Farrell v. United States*, 336 U.S. 511, 517 (1949) (holding that seaman whose injury was "due to no negligence but his own" was nevertheless "entitled to the usual measure of maintenance and cure at the ship's expense"); *Aguilar*, 318 U.S. at 731 ("Conceptions of contributory negligence, the fellow-servant doctrine, and assumption of risk have no place in the liability or defense against [a claim for maintenance and cure]. Only some wilful misbehavior or deliberate act of indiscretion suffices to deprive the seaman of his protection.").

Second, under *McCorpen v. Central Gulf S.S. Corporation*, 396 F.2d 547 (5th Cir. 1968), a seaman who willfully conceals a pre-existing injury from his employer may not recover damages for maintenance and cure if that injury is reactivated or aggravated during a later voyage. *See id.* at 549; *see also Brown v. Parker Drilling Offshore Corp.*, 410 F.3d 166, 171 (5th Cir. 2005) ("An employer is allowed to rely on certain legal defenses to deny [maintenance and cure] claims. One such defense is that the injured seaman willfully concealed from his employer a preexisting medical condition."); 1B Michael F. Sturley, *Benedict on Admiralty* § 46 (2008). A maritime employer who seeks to

invoke the *McCorpen* defense must prove that: (1) the claimant intentionally misrepresented or concealed medical facts; (2) the non-disclosed facts were material to the employer's decision to hire the claimant; and (3) a connection exists between the withheld information and the injury complained of in the lawsuit. *McCorpen*, 396 F.2d at 548-49; *Johnson v. Cenac Towing,* Inc., 544 F.3d 296, 301 (5th Cir. 2008); *Brown*, 410 F.3d at 171; *Jenkins v. Aries Marine Corp.*, 590 F. Supp. 2d 807, 812-14 (E.D. La. 2008); *Parker v. Jackup Boat Serv., LLC*, 542 F. Supp. 2d 481, 493-95 (E.D. La. 2008).

## 2. <u>Findings</u>

First, the Court finds that Owens has not carried his burden of proof to show that his shoulder injury occurred while he was "subject to the call of duty as a seaman." *Aguilar*, 318 U.S. at 732. Owens left Abdon Callais's employ in August 2010, and his medical records do not reflect any complaints of shoulder pain until September 16, 2010.[89] As discussed above, although Owens testified that he began experiencing slight shoulder pain immediately following the incident,[90] the Court does not find that testimony credible. After the incident, Owens complained exclusively of back pain. Lacangelia Owens, Mr. Owens's wife,

---

[89]  (Jt. Ex. 16 at 75; Trial Tr., Day II at 54.)

[90]  (Trial Tr., Day I at 98.)

indicated that Owens first noticed pain in his shoulder only after his August 25, 2010 back surgery.[91]  And Dr. Nutik opined that, while Owens showed objective signs of shoulder injury, Owens's shoulder injury was not related to the December 30, 2009 incident.  Based on this testimony and the evidence in the record, the Court finds that Owens has not established that his shoulder injury occurred while he was an employee of Abdon Callais.  He is therefore not entitled to maintenance and cure for that injury.

Moreover, although Owens injured his back while in the service of a vessel, and would therefore typically be entitled to maintenance and cure for that injury until the point of maximum medical cure, the Court finds that Abdon Callais has proved the three elements of the *McCorpen* defense with respect to that injury.  First, Abdon Callais has proved that Owens intentionally misrepresented or concealed medical facts.  "Failure to disclose medical information in an interview or questionnaire that is obviously designed to elicit such information [ ] satisfies the 'intentional concealment' requirement."  *Id.*  As discussed above, Owens's medical records reflect that Owens went to the emergency room on July 18, 2006 complaining of low back pain for a period of two weeks and decreased sensation/numbness in the left

---

[91]     (*Id.* at 37, 42-43.)

27

thigh.[92]  Owens was given Tylenol 3 for pain and prescribed a steroid and an anti-inflammatory.[93]  An X-ray conducted at Sacred Heart Hospital on the same day revealed "[s]light posterior listhesis of L5 relative to S1 and slight posterior positioning of the distal coccyx."[94]  These earlier maladies affected the same body part that Owens now injured, namely his lower spine and left leg.

Yet, on Owens's May 21, 2007 medical history questionnaire, which Owens was required to submit along with his employment application, Owens circled "N" for "Injured back/back pain" when asked to "Circle Y for YES and N for NO if you currently have the following symptoms or have significantly in the past."[95]  At trial, Owens testified that he did not intend to deceive Abdon Callais in filling out the form, stating that he did not consider his earlier back pain to have been "significant."[96]  Owens's explanation is unconvincing.  Following the accident, Owens gave a recorded statement to Abdon Callais in which he denied ever having "any pain" associated with his low back in the past.  As Owens has never indicated that he forgot about his July 2006

---

[92]   (Jt. Ex. 6 at 76; Rak Depo. at 11).

[93]   (Jt. Ex. 6 at 82; Rak Depo at 9, 18.)

[94]   (Jt. Ex. 6 at 79.)

[95]   (Jt. Ex. 10 at 6; Trial Tr., Day I at 55.)

[96]   (Trial Tr., Day I at 55.)

emergency room visit, his denial of any pain undermines his
contention that he did not disclose his earlier back problems on
the questionnaire because he did not believe them to be
significant and suggests that he intended to deceive Abdon
Callais as late as January 2010.  Nevertheless, whether Owens
subjectively believed his answers were true is immaterial, as the
Fifth Circuit has been clear that the intentional concealment
prong is an objective test.  *See Brown*, 410 F.3d at 174.  The
medical records reflect that Owens suffered from back pain for at
least two weeks that was serious enough to occasion a visit to
the emergency room and that he received prescription medications
for his condition.  Owens stated at trial that the pain persisted
for one and a half to two days after his emergency room visit.[97]
Under these circumstances, the Court finds that Owens's 2006
lower back pain with numbness in his left leg was objectively
significant, and, accordingly, that the intentional concealment
prong of the *McCorpen* test has been met.

Second, the Court finds that Owens undisclosed back pain was
material to Abdon Callais's decision to hire him.  "The fact that
an employer asks a specific medical question on an application,
and that the inquiry is rationally related to the applicant's
physical ability to perform his job duties, renders the
information material for the purposes [of the *McCorpen* defense.]"

---

[97]     (*Id.* at 56.)

*Brown*, 410 F.3d at 175; *see also Jauch*, 470 F.3d at 212-13
(holding that the shipowner "clearly met" the *McCorpen* test, in
part, because plaintiff was required to complete a medical
questionnaire specifically designed to elicit information about
past injuries or health problems and plaintiff concealed
instances of back injury and mental health problems which would
have either prevented or delayed his employment).  Although
Owens's medical history questionnaire was administered by doctors
at Complete Occupational Health Services, William Foret, Abdon
Callais's President and CEO, testified that Abdon Callais relies
on the doctors' assessment of its potential employees in making
its hiring decisions.[98]  Because the nondisclosed information was
rationally related to determining whether Owens has the physical
capacity to perform the job, and Abdon Callais based its hiring
decision, at least indirectly, on Owens's misrepresentations,
Abdon Callais has established that Owens's nondisclosed back pain
was material for the purposes of *McCorpen*.

Finally, the Court finds that a "connection" exists between
the nondisclosed information and the injury complained of in the
lawsuit.  *Brown*, 410 F.3d at 171.  The Fifth Circuit has
"routinely found" that a causal link exists when the plaintiff
claims an injury "to the exact same [*sic*] area . .  as was
previously injured."  *Id.* at 176-77 (holding that employer had

---

[98]    (*Id.* at 22-23.)

established a "causal relationship" between the plaintiff's earlier back injuries and the herniated disc injury that was at issue in the litigation because the old and the new injuries "were to the same location of the [plaintiff's] lumbar spine"); *see also Jauch*, 470 F.3d at 212-13 (finding the requisite connection where the new back injury was "virtually identical" to a previous back injury); *Johnson v. Cenac Towing, Inc.*, 599 F. Supp. 2d 721, 278-29 (E.D. La. 2009) (explaining that the "same body part" test is not the same as proximate causation analysis); *Jenkins*, F. Supp. 2d at 813 ("To find a requisite 'connection,' courts have looked to whether the injuries were identical or produced identical or substantially similar symptoms in the same part of the body.").  Owens withheld information that he had suffered from lower back pain with numbness in his left thigh in the past, and he now seeks maintenance and cure for injuries to the same portion of his back and leg.  Indeed, Dr. Nutik testified that Owens's complaints following the incident – low back pain with numbness in his left lower extremity – were identical to those in 2006 and that both sets of complaints were consistent with a herniated disc.[99]  Accordingly, under the current state of the law, the conclusion is inescapable that Owens is not entitled to maintenance and cure for his back injury.

---

[99]    (Trial Tr., Day II at 61-62.)

Because Abdon Callais has paid Owens some maintenance, Abdon Callais is entitled to a credit for those payments against any damages that Owens is awarded.  Owens remained in Abdon Callais's employ through August 8, 2010.  During that time, Owens received a wage of $200.00 per day for every day that he remained at Abdon Callais's bunkhouse facility.  When he did not stay at the bunkhouse, he was not paid his wage but received maintenance at a rate of $15.00 per day.  A review of Owens's employment records reveals that Owens did not work, and therefore received maintenance, for 36 days during that period.[100]  Abdon Callais also paid Owens maintenance at the same rate from August 9, 2010 until trial, a total of 357 days.  The Court thus calculates Abdon Callais's total maintenance payments to be $5,895.00 ((36 + 357) * $15.00).  The Court will deduct that amount from the damages owed to Owens as a credit for payment of maintenance.

## II.  DAMAGES

Under the Jones Act, a plaintiff may recover all of his pecuniary losses.  *Cruz v. Hendy Int'l Co.*, 638 F.2d 719, 723 (5th Cir. 1981), *rev'd on other grounds by Michel v. Total Transp., Inc.*, 957 F.2d 186, 191 (5th Cir. 1992).  Pecuniary loss may include loss of earning capacity, medical expenses, and pain and suffering resulting from an injury caused by negligence

---

[100]   (Jt. Ex. 2 at ACO 0008 - ACO 00043.)

and/or unseaworthiness.  *Daigle v. L & L Marine Transp. Co.*, 322 F. Supp. 2d 717, 730 (E.D. La. 2004) (citing Thomas J Schoenbaum, *Admiralty and Maritime Law* § 5-15, at 234).  The parties have stipulated to the admission of two expert economic reports, one from Dr. G. Randolph Rice[101] (plaintiff's expert) and one from Dr. Kenneth J. Boudreaux[102] (defendant's expert).  Based on this evidence and the evidence presented at trial, the Court makes its findings as to Owens's damages as follows.

## A.   Past Lost Wages

Owens is entitled to any wages that he would have earned had he continued to work as a deckhand through the date of trial, less (1) any wages that Abdon Callais paid him; and (2) any wages that he could have earned despite his physical condition.  *See Eugene v. Mormac Marine Transp., Inc.*, 48 F.3d 529, 1995 WL 840779, at *4 (5th Cir. 1995) (finding appropriate an award for past lost wages up to the point at which defendant could return to work); *Daigle*, 322 F. Supp. 2d at 731 (subtracting amounts earned after plaintiff's injury from his past loss); *In re Diamond B Marine Servs., Inc.*, Civ. A. No. 99-951, 2001 WL 1164914, at *18 (E.D. La. 2001) (holding that allowing recovery for wages paid by plaintiff's employer would amount to "double

---

[101]   (Pl. Ex. 3.)

[102]   (Def. Ex. 2.)

recovery"); *Crum v. United States*, Civ. A. No. 99-2178, 2000 WL 943253, at *3 (E.D. La. 2000) (finding that where an injury did not prevent the plaintiff from returning to work, he was not entitled to past wages).  In the maritime context, an award for lost wages must be based on after-tax earnings.  *See Myers v. Griffin-Alexander Drilling Co.*, 910 F.2d 1252, 1256 (5th Cir. 1990) (citing *Hernandez v. M/V Rajaan*, 841 F.2d 582, 587 (5th Cir. 1988)).

Owens's accident occurred on December 30, 2009.  Owens, however, continued to work for Abdon Callais on light duty through August 8, 2010.  Based on Owens's past yearly earnings as represented by his Social Security records, Owens's economic expert, Dr. Rice, calculates Owens's past lost wage from August 9, 2010 until August 1, 2011, the date of trial, to be $40,338.00.[103]  Abdon Callais's expert, Dr. Boudreaux, uses the same estimation of Owens's past yearly earnings and arrives at a similar figure, $40,608.60, for his lost wages since the date of the accident.[104]  The Court credits the estimate of Dr. Rice because it gives Abdon Callais a credit for all of Owens's light duty work, whereas Abdon Callais's expert does not explicitly do so.  Accordingly, the Court awards $40,338.00 in lost past wages.

---

[103]    (Pl. Ex. 3 at 1-2.)

[104]    (Def. Ex. 2 at 8.)

**B.   Future Lost Wages**

The Fifth Circuit established the method for calculating future lost wages in maritime cases in *Culver v. Slater Boat Co.*, 722 F.2d 114 (5th Cir. 1983).   In that case, the court set forth a four-step process for determining lost wages as follows: (1) estimate the loss of work life or expected remaining work-life of the plaintiff; (2) calculate the lost income stream; (3) compute the total lost income stream; and (4) discount that total to present value.   *Id.* at 517.   Any award for future lost wages in the maritime context also must be based on after-tax earnings. *Hernandez*, 841 F.2d at 587; *Culver*, 722 F.2d at 117 (stating that in calculating future lost earnings, "the fact-finder should subtract amounts that the wage earner would have been required to pay, such as income tax and work expenses").

Owens submitted the report of a vocational rehabilitation expert, Nathaniel Fentress, who offered his assessment of Owens's future employment and wage prospects.[105]   Fentress opines, based on an examination of Owens's educational history, vocational history, medical history, and aptitude tests, that Owens's capacity to ever return to his usual occupation as an engineer or his previous occupations as an able bodied seaman, deckhand, laborer, or painter is poor.[106]   Fentress puts Owens's chances of

---

[105]   (Pl. Ex. 4.)

[106]   (*Id.* at 10.)

35

reentering and maintaining alternate gainful employment as fair to poor, explaining that Owens's recovery from his lumbar spine surgery "will be a direct indicator of whether he will ever have the capacity to re-enter and maintain alternate gainful employment over his work life expectancy."[107]   Assuming that Owens is able to recover from that surgery, Fentress indicates that Owens could earn between minimum wage and $9.50 an hour in entry level sedentary to light duty jobs.[108]   Fentress provides four examples of such jobs: Light Duty Delivery Driver; Parking Lot Attendant; Assembler, Bicycles; and Chauffeur.[109]

Abdon Callais presented the report of its own vocational rehabilitation expert, Larry Stokes.[110]   Stokes also reviewed Owens's educational history, medical history, vocational history, and aptitude tests.   Relying primarily on Dr. Cenac's testimony that Owens could have potentially returned to his job as an unlicensed engineer six months after surgery, Stokes opines, "Given this medical information, it is within reasonable rehabilitation probability that Mr. Owens may be capable of currently working without restrictions."[111]   Stokes further

---

[107]   (*Id.* at 11.)

[108]   (*Id.* at 11.)

[109]   (*Id.* at 11.)

[110]   (Def. Ex. 1.)

[111]   (*Id.* at 9.)

states: "If Mr. Owens returns to work as an unlicensed engineer, he would not experience a loss of expected earnings."[112]   In the alternative, assuming that Owens is limited to only sedentary positions in the future, Stokes indicates that Owens would be able to find employment as a Dispatcher, Surveillance System Monitor, Escort Vehicle Driver, Cashier, and Assembler.   The average weekly wage for those positions, according to Stokes, ranges between $355.20 and $592.40.[113]   Assuming a 40 hour work-week, these positions would pay between $8.88 and $14.81 per hour.   Abdon Callais also submits the report of Dr. Boudreaux, who assumed that Owens will be able to earn his regular income in the future and, based on that assumption, concluded that Owens will have no future wage loss.[114]

Based on the vocational experts' opinions and the other evidence presented at trial, the Court finds that Owens will not be able to return to his previous job as an engineer.   Although Dr. Cenac testified that, had he performed the surgery, Owens "potentially" would have been able to return to his previous job within six months,[115] the Court notes that Dr. Cenac did not, in fact, perform the surgery and that Dr. Cenac has not examined

---

[112]   (*Id.* at 9.)

[113]   (*Id.* at 10.)

[114]   (Def. Ex. 2 at 8.)

[115]   (Jt. Ex. 23 at 20-21.)

37

Owens since July 19, 2010.[116]  The Court credits Fentress's assessment that, given Owens's back condition, that he underwent major surgery, and his age, he will be limited to full-time, sedentary work at a wage between minimum wage and $9.50 per hour. The Court therefore concludes that Owens will not be able to return to any of his previous jobs, which are all categorized as either medium to heavy labor occupations.[117]

In finding that Owens will be limited to sedentary jobs paying between minimum wage and $9.50 per hour, the Court rejects Stokes's opinion that Owens could find work that pays a higher wage.  The Court does not find Stokes's conclusions credible because, for example, he indicated that Owens could work as a surveillance system monitor, cashier, or security guard.  Given Owens's criminal history, these conclusions are overly optimistic.

Using an estimated worklife of 14.22 years and Owens's pre-injury salary, Owens's economist, Dr. Rice, estimates that the present value of Owens's future, after-tax wage loss is $633,256.00.  Rice further estimates that, if Owens were to return to a job paying between minimum wage and $9.50 per hour at 40 hours per week, his net future discounted wage loss would be $410,271.00.  The Court credits this estimation and awards Owens

---

[116]    (*Id.* at 16.)

[117]    (Pl. Ex. 4 at 4-9.)

$410,271.00 for future lost wages.

## C.   Fringe Benefits

Owens is also entitled to any loss of fringe benefits caused by Abdon Callais's negligence.  *See, e.g.*, *McGee v. Rowan Companies, Inc.*, 2009 WL 3150309, at *3 (E.D. La. 2009) (awarding fringe benefits to a Jones Act seaman).  Dr. Rice calculates that the present value of Abdon Callais's contributions to Owens's 401(k) plan is $29,331.00, and the present value of Abdon Callais's payment of Owens's health and life insurance premiums is $143,003.00.  Abdon Callais has offered no evidence to dispute these calculations.  And neither Fentress or Stokes indicated in their reports that the alternate occupations available to Owens would provide him with health insurance, life insurance, or 401(k) contributions.  The Court therefore finds that Owens is entitled to $172,334.00 in lost fringe benefits.

## D.   Pain and Suffering

Owens has endured pain and suffering associated with his back injury.  The Court does not consider any pain and suffering that Owens might have suffered as a result of his alleged shoulder injury because Owens has failed to establish a causal connection between the incident and that condition.  As a result of picking up the mud hose, Owens suffered over seven months of

39

debilitating pain in his lower back before undergoing a partial
disectomy at the L5-S1 and a foraminotomy at the L4-L5.  Owens
has been unable to engage in various activities that he enjoyed
before he was injured in the December 2009 incident.  For
instance, Owens's back pain has prevented him from playing with
his children, socializing, and maintaining his home and yard.
And Owens's wife attested to the emotional toll that Owens's
injury has taken on Owens and his family, explaining that Owens
was "sinking into depression" as a result of his pain.[118]  For
these reasons, the Court finds that Owens is entitled to an award
of $150,000.00 for past mental and physical pain and suffering.
As to future pain and suffering, Owens testified that, although
that surgery provided him some relief, he still experiences
residual pain and difficulty standing for prolonged periods.[119]
In order to cope with this pain, Owens is currently taking
oxycodone, which makes him lethargic and keeps him from
driving.[120]  Owens's treating physician, Dr. Wolff, recommended
conservative treatment for Owens's pain, and suggested avenues
such as physical therapy and yoga that could help him cope with
his symptoms going forward.  Based on this testimony, the Court
awards $75,000.00 for future mental and physical pain and

---

[118]    (Trial Tr., Day I at 34.)

[119]    (Trial Tr., Day I at 103.)

[120]    (*Id.* at 105.)

suffering.

**E.   Past and Future Medical Expenses**

It is undisputed that Abdon Callais paid Owens's medical expenses from the date of the incident until August 9, 2010, when Owens's left Abdon Callais's employ.[121]  The record reflects that, since returning to Florida, Owens has incurred medical expenses in the amount of $12,735.27, as evidenced by a June 15, 2011 letter from Owens's insurer, Blue Cross Blue Shield of Louisiana.[122]  The record also indicates that Owens recently underwent a series of three epidural steroid injections to his lower spine administered by Dr. David Fairleigh.[123] Unfortunately, there is no indication of the cost of that procedure.  It appears, however, that when Owens received epidural steroid injections from Dr. Michael Haydel in early 2010, that the cost of each injection was about $1,450.00 per injection.[124]  The Court therefore awards $4,350.00 ($1,450.00 *3) in damages as an estimation of Owens's additional unpaid past medical expenses, resulting in a total of $17,085.27.

As to future medical expenses, the Court rejects Owens's

---

[121]   (*Id.* at 106-07.)

[122]   (Pl. Ex. 1 at 1.)

[123]   (Jt. Ex. 15.)

[124]   (Jt. Ex. 12 at 1.)

suggestion at trial that he may undergo additional back surgery, finding instead that Owens will require only conservative treatment in the future.  The Court relies on the testimony of Dr. Wolff, Owens's treating physician, who explained that Owens's back surgery proceeded without complication.  Although Dr. Wolff testified that Owens reported continued back pain, Dr. Wolff recommended that Owens manage these difficulties with physical therapy, yoga, epidural steroids, and anti-inflammatories.[125] Moreover, Dr. Wolff indicated that, although a fusion of Owens's lumbar spine is an option, that surgery is "a really big operation" and should only be considered as a last resort.[126]  The Court also credits Dr. Nutik's testimony that, during his February 9, 2011 exam, Owens displayed inconsistencies in his ability to move and tolerate pain.  This suggests that Owens's symptoms are not as severe as he relates and supports the Court's finding that an invasive lumbar fusion will not be necessary.

With regard to conservative treatment options, it is apparent that Owens will incur some future medical costs related to his back injury.  Yet, Owens has not provided the Court with any sort of protocol indicating what treatment he might need, how long any such treatment would be required, or how much it would cost.  Owens testified at trial that he is still taking

---

[125]    (Jt. Ex. 26 at 20-23.)

[126]    (Jt. Ex. 26 at 23.)

42

medication related to his injury and that he recently underwent a series of epidural steriod injections.  Based on this testimony, and Dr. Wolff's indication that Owens may require epidural steriod injections in the future, the Court awards Owens $7,000.00 as a reasonable estimate of the cost of his prescription costs over the next year and an additional round of epidural steroid injections.

**F.   Pre-Judgment Interest**

In admiralty, the Court has the discretion to award pre-judgment interest.  There is a strong presumption in favor of awarding pre-judgment interest, and it will usually be denied only in cases in which the plaintiff exercised undue delay in bringing his action.  *U.S. v. Ocean Bulk Ships, Inc.*, 248 F.3d 331, 344 (5th Cir. 2001).  When a Jones Act case is tried to a jury, the Court may not award pre-judgment interest, but when a Jones Act case is tried to the Court, it may award pre-judgment interest.  *McPhillamy v. Brown & Root*, 810 F.2d 529, 532 (5th Cir. 1987); *Bush v. Diamond offshore Co.*, 46 F. Supp. 2d 515, 523 (E.D. La. 1999).  It is within the discretion of the Court to select an equitable rate of pre-judgment interest.  *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 984 (5th Cir. 1991).  The Court finds no delay here and that the plaintiff is thus entitled to receive pre-judgment interest at .11 percent, which is the

most recently quoted rate for one-year constant-maturity treasury bills, from the date of judicial demand until the date of payment.  Pre-judgment interest may be awarded only on damages that have actually accrued as of the date of judgment.  *Martin v. Walk, Haydel & Assocs., Inc.*, 794 F.2d 209, 212 (5th Cir. 1986).

## III. SUMMARY

On the basis of the foregoing findings of fact and conclusions of law, the Court finds that the plaintiff, Eric Owens, has sustained damages due to the negligence of Abdon Callais.  Accordingly, the plaintiff is entitled to recover from the defendant the following damages:

| | | |
|---|---|---|
| A. | Past Wage Loss: | $ 40,338.00 |
| B. | Future Wage Loss: | $410,271.00 |
| C. | Fringe Benefits Loss: | $172,334.00 |
| D. | Past Pain and Suffering: | $150,000.00 |
| E. | Future Pain and Suffering: | $ 75,000.00 |
| F. | Past Medical Expenses | $ 17,085.27 |
| G. | Future Medical Expenses: | $  7,000.00 |
| | Total Damages: | $872,028.27 |

Because Owens was found 30 percent contributorily negligent, Abdon Callais will bare 70 percent of Owens's damages.  Moreover, Abdon Callais is entitled to subtract $5,895.00 for its payment

of maintenance.  Adjusting for contributory negligence and then crediting Abdon Callais for its maintenance payments reduces the total judgment to $604,524.79.  Owens is entitled to pre-judgment interest on past damages from the date of judicial demand until the date paid, and he is entitled to post-judgment interest on all remaining damages from the date of judgment until the date paid.  Both pre- and post-judgment interest is to be calculated at a .11 percent per annum rate.

New Orleans, Louisiana, this 19th day of August, 2011.

_____

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE